1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10    SHERMAN JONES, et al.,

11              Plaintiffs,                    No. 2:10-cv-2174 KJN P

12        vs.

13    C. CANNEDY, et al.,                     ORDER and

14              Defendants.                   FINDINGS AND RECOMMENDATIONS

15    _____/

16              Plaintiff is a state prisoner at California State Prison-Sacramento ("CSP-SAC")

17    proceeding without counsel who seeks relief pursuant to 42 U.S.C. § 1983.  Framed as a class

18    action, plaintiff pursues this action on his own behalf and on behalf of other inmates who

19    participated in the principal underlying administrative appeal.  In addition, plaintiff requests

20    leave to proceed in forma pauperis pursuant to 28 U.S.C. § 1915, and moves for a preliminary

21    injunction.  This proceeding was referred to this court pursuant to 28 U.S.C. § 636(b)(1) and

22    Local Rule 302.

23    IN FORMA PAUPERIS APPLICATION

24              Plaintiff has submitted a declaration that makes the showing required by

25    28 U.S.C. § 1915(a).  Accordingly, the request to proceed in forma pauperis will be granted.

26              Plaintiff is required to pay the statutory filing fee of $350.00 for this action.

1

28 U.S.C. §§ 1914(a), 1915(b)(1).  By this order, plaintiff will be assessed an initial partial filing fee in accordance with the provisions of 28 U.S.C. § 1915(b)(1).  By separate order, the court will direct the appropriate agency to collect the initial partial filing fee from plaintiff's prison trust account and forward it to the Clerk of the Court.  Thereafter, plaintiff will be obligated to make monthly payments of twenty percent of the preceding month's income credited to plaintiff's prison trust account.  These payments will be forwarded by the appropriate agency to the Clerk of the Court each time the amount in plaintiff's account exceeds $10.00, until the filing fee is paid in full.  28 U.S.C. § 1915(b)(2).

SCREENING OF COMPLAINT

        The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2).

        A claim is legally frivolous when it lacks an arguable basis either in law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989); Franklin v. Murphy, 745 F.2d 1221, 1227-28 (9th Cir. 1984).  The court may, therefore, dismiss a claim as frivolous when it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless.  Neitzke, 490 U.S. at 327.  The critical inquiry is whether a constitutional claim, however inartfully pleaded, has an arguable legal and factual basis.  See Jackson v. Arizona, 885 F.2d 639, 640 (9th Cir. 1989); Franklin, 745 F.2d at 1227.

        Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

1    (1957)).  In order to survive dismissal for failure to state a claim, a complaint must contain more

2    than "a formulaic recitation of the elements of a cause of action;" it must contain factual

3    allegations sufficient "to raise a right to relief above the speculative level."  Id.  However,

4    "[s]pecific facts are not necessary; the statement [of facts] need only 'give the defendant fair

5    notice of what the . . . claim is and the grounds upon which it rests.'"  Erickson v. Pardus, 551

6    U.S. 89, 93 (2007) (quoting Bell Atlantic Corp., 550 U.S. at 555) (citations and internal

7    quotations marks omitted).  In reviewing a complaint under this standard, the court must accept

8    as true the allegations of the complaint in question,  id., and construe the pleading in the light

9    most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

10          The complaint herein is framed as a class action, and the principal underlying

11   administrative appeal, Log No. SAC-B-10-00206 (hereafter "Group Appeal"), was filed and

12   exhausted as a group appeal challenging the inclusion of "Non-Affiliated Black" inmates in a

13   "Modified Program" (lockdown) instituted at CSP-SAC on January 19, 2010.  The complaint

14   tracks the allegations of that administrative appeal.  The complaint names four defendants:  C.

15   Cannedy, B-yard Lieutenant; J. Hansen, B-yard Sergeant; J.W. Baker, B-yard Sergeant; and Tim

16   Virga, CSP-SAC Warden.[1]

17          Because plaintiff also seeks preliminary injunctive relief, the court reviews the

18   underlying factual allegations in detail.  As alleged in the complaint, the relevant facts

19   commenced January 19, 2010, with a riot between "Black disruptive groups" and "Southern

20   Hispanics" in the "B Facility" school and library at CSP-SAC, resulting in serious injuries to two

21   inmates.  In response, CSP-SAC staff immediately placed "all General Population inmates

22   identified as Blacks and Southern Hispanics, and their cell mates, on a Modified Program" which

23   widely suspended prison activities for these inmates, and imposed the use of restraints and

24

25          [1]  Although the complaint states elsewhere that "there are (10) ten main defendants (and
     many more unlisted)" (Cmplt. at 5), this appears to be a drafting error, intended to reference the
26   ten principal plaintiffs (id.).

1    escorts for their movements.  (See Dkt. No. 1 (Complaint) (hereafter "Cmplt."), at p. 29[2] (B

2    Facility Program Status Memo, dated January 19, 2010)).  On January 21, 2010, the Modified

3    Program was broadened to apply to "all General Population inmates identified as Blacks,

4    Southern Hispanics, Mexican Nationals (Paisa), and their cell mates" pending further assessment.

5    (Id. at 30 (B Facility Program Status Memo, dated January 21, 2010)).

6           On January 30, 2010, plaintiff and others filed the underlying Group Appeal.

7    (Cmplt. at 7, 24-43.)  Defendant Hansen interviewed plaintiff pursuant to the First Level Review,

8    and "partially granted" the appeal based on the inquiry he conducted.  The First Level Review

9    decision states in pertinent part (id. at 34-35):

10          You have not supplied enough reliable data to verify the existence,
            membership, and non-involvement of any Black sub-groups included in
11          your proposed groups labeled as "Black Non-affiliate" or as "Black
            Muslim."  Also, you have not fully demonstrated that the Black population
12          which remained in B-Facility General Population after the apparently
            involved inmates were sent to Administrative Segregation had not been
13          involved in the incident, are not currently involved in subverting the safety
            and security of the institution, and will not in the future be involved as
14          either suspect, victim or in any other manner, in violence or any other type
            of ramification possibly related to the January 19, 2010 racial riot.

15   The complaint alleges that Hansen, pursuant to this First Level Review, "misquoted facts of the

16   interview" and "could not present a logical explanation as to why Black Non-Affiliates were still

17   on lock-down.  At one point he 'pretended' to be unaware of how to distinguish between 'Black

18   disruptive groups' and 'Black Non-Affiliates inmates'—as if there was no classification system.

19   [¶ ] Sgt. Hansen did agree that 60 days was 'long enough' for staff to figure out who the non-

20   affiliates were."  (Id. at 7, 8.)

21          On March 25, 2010, defendant Virga (CSP-SAC Warden) issued the Second

22   Level Review, "partially granting" the Group Appeal based on Virga's investigation of the

23   matter.   Virga concluded in pertinent part (Cmplt. at 39):

24          Your request that SAC B Yard staff cease the racial discrimination of

25   _____

26        [2]  Page designations reference the court's electronically-generated pagination.

                                           4

1   locking down all of the African American inmates who are not classified
    as disruptive and not involved in the January 19, 2010 incident is denied
2   based on your claim of racial discrimination is unfounded at the SLR
    (Senior Level Review).  Your request to immediately restore all privileges
3   to non-affiliated Black/Muslim inmates is partially granted based on
    canteen, quarterly packages, and education privileges have been restored
4   (sic).[3]  You are reminded that Modified Program/Facility lockdown is used
    as a temporary precautionary measure to mitigate the potential for future
5   violence.  Additionally, the Modified Program will be continuously
    reviewed and evaluated by the Warden and departmental administrators.
6   Every effort will be made to return to normal program as soon as it is safe
    to do so.

7

8   The complaint alleges that defendant Virga, like defendant Hansen "never answered the obvious

9   'racial discrimination' question presented in the 602/group appeal."  (Cmplt. at 9.)

10                    On June 28, 2010, the Director's Level Review denied the Group Appeal, signed

11  by C. Holstrom, Appeals Examiner, Inmate Appeals Branch, and D. Foston, Chief, Inmate

12  Appeals Branch.  (Cmplt. at 41-42.)  That decision states in pertinent part (id.):

13              The appeals examiner notes that the appellant's key argument is that black
                inmates who were not involved in the incident of January 19, 2010, have
14              been unfairly punished since they have been placed on a lengthy modified
                program solely on the basis of their race.
15
                . . . On June 9, 2010, the appeals examiner spoke with Facility "B"
16              Correctional Lieutenant (Lt.) C. Cannedy regarding the status of the
                modified program and the reasons why all southern Hispanics and black
17              inmates were placed on lockdown. Lt. Cannedy stated that the January 19,
                2010, incident involved attacks with weapons by gang or disruptive group
18              affiliated black inmates upon southern Hispanic inmates in classrooms and
                the law library.  Southern Hispanic inmates sustained serious injuries.
19              Both affiliated and non-affiliated black inmates were present in the areas
                where the assaults occurred.  Inmates were placed on modified program
20              pending searches, interviews and investigation.

21              SAC staff have continuously received information from a variety of
                sources that more violence will occur if any black and Hispanic inmates
22              are placed together, regardless if the black is affiliated or non-affiliated.
                Lt. Cannedy stated that inmates who remain on modified program have
23              been given access to yard exercise on concrete yards as of April 5, 2010.
                Outdoor yard exercise is arranged by racial and ethnic groups to prevent
24              possible violence.  SAC staff intend to begin the controlled release of non-
                affiliated inmates beginning on June 14, 2010, if there is no new
25

26      [3]  See n.4, infra, and related text.

                                            5

information of planned attacks or incidents of racial violence.  Staff have
repeatedly interviewed inmates and conducted central file reviews to
determine which inmates can be considered unaffiliated.

The examiner finds that SAC staff have properly maintained some
segments of the Facility "B" inmate population on modified program
based upon continuing receipt of credible information that racially based
attacks will occur if any black inmates, affiliated or non-affiliated, are
released and placed together with southern Hispanic inmates.  There is no
evidence that the modified program is discriminatory.  It clearly involves
distinct racial or ethnic groups (blacks and southern Hispanics) since they
were involved in the violent attacks that occurred in January and intend to
continue engaging in violence against each other upon release.  The
examiner notes that staff have progressively restored programs and
privileges consistent with facility security and the results of the continuing
investigation into ongoing threats of racial violence.  The examiner finds
that the appellant has not presented any tangible proof of his assertion that
SAC staff have restricted all black inmates to a modified program due to
racial discrimination.  Race based program modifications are not
inherently discriminatory.  The current program modification is directly
related to serious violence between two racial groups and the continuing
threat of further violence.  No relief is warranted at the DLR (Director's
Level Review).

Plaintiff names as defendants neither Holstrom nor Folston, but alleges in the complaint that they

improperly relied on the statements of defendant Cannedy at the Third Level Review, viz., that

Cannedy "failed to mention that Black Disruptive Groups were treated exactly like 'Black Non-

Affiliated inmates' who were not involved in racial incident," and that Cannedy's decision to

authorize the "controlled release of non-Affiliates" was improperly characterized as a "solution"

to the imbalanced "lock-down problem."  (Cmplt. at 11.)

Both the Modified Program and the ongoing assessment of the program remained

in place in May 2010.  (Id. at 63 (B Facility Memorandum, dated May 10, 2010)).

Meanwhile, on March 10, 2010, plaintiff filed a related appeal challenging the $45

draw limit to prisoners on the Modified Program, Log. No. SAC-B-10-00433 ("Canteen

Appeal").  (Cmplt. at 8, 45-52.)  Defendant Hansen interviewed plaintiff pursuant to the First

Level Review and, on March 31, 2010, "partially granted" the appeal based on the attendant

inquiry, noting that canteen access had been improved pursuant to March 10, 2010, and March

17, 2010, Program Status Memoranda.[4]  On May 5, 2010, the appeal was partially granted at the Second Level Review (no written decision provided); however, it does not appear that plaintiff exhausted this claim at the Third Level Review.  (Cmplt. at 46.)  The complaint alleges that, during the First Level interview process on this appeal, Hansen "[a]gain could not put forth a logical explanation as to why all blacks were being treated exactly like the disruptive groups. . ." (Id. at 8.)

On June 14, 2010, a "categorized release" of "three Mexican National inmates and three Black Non-Affiliated inmates" occurred in the Main Yard.  (Cmplt. at 62 (B Facility Program Status Memo, dated July 12, 2010)).  "The three Mexican National inmates attacked the Black Non-Affiliated inmates," and were therefore "returned to the Modified Program with Black Disruptive Groups and Southern Hispanics."  (Id.)  Despite this incident, B-Facility staff were instructed to continue reviewing files and conducting interviews "to prepare for a foreseen attempt to resume normal yard program on Monday, July 19, 2010, with another small group of categorized Black and Hispanic inmates."  (Id.)

The complaint alleges that defendant Baker informed plaintiff of the controlled release plan a week before the June 14, 2010 incident, in response to which plaintiff informed Baker "that putting 'Hispanics and Blacks' back on the 'same yard' would result in violence," and that "there would be a retaliation attack on 'any Black,'" (Cmplt. at 11-12), consistent with Cannedy's documentation referenced in the Third Level Review that Southern Hispanics would attack "any Black" if placed in "same yard" (id. at 11).

The complaint also alleges that B-Facility staff are intentionally setting up altercations between "Non-Affiliated Black" and Hispanic inmates in order to justify continuation of the Modified Program.  Plaintiff directs the court to the circumstances of the June

---

[4]  In March 2010, minor changes were noted regarding lessened restrictions for the identified group (e.g., from "no canteen" to a $45 canteen limit, from "no education" to "authorized cell study") pending the still-ongoing assessment of the January incident.  (Cmplt. at 54 (B Facility Program Status Memo, dated March 17, 2010)).

14, 2010 incident, as well as an incident that took place on July 13, 2010, when a black inmate named Broussard, released to shower, was seriously attacked by a Southern Hispanic who was also released from his cell.  Plaintiff claims that these incidents, and any other plans of B-Facility staff to contemporaneously release selected "Black Non-Affiliated" and Southern Hispanic inmates are "race-gladiator scenes" constituting a "failure to protect" plaintiff and other "Black Non-Affiliated" inmates "from 'well known in advanced (sic)' attacks" in violation of the Eighth Amendment.  (Cmplt. at 19-20.)  Plaintiff asserts that this conduct is "deliberate," "knowing" and "intentional," causing plaintiff and other non-affiliated black inmates "injuries, stress, mental anguish, fear, depression [and] paranoia," and causing "'additional mental harm,' pain and suffering" to those inmates on medication.  (Id.)  Plaintiff has attached copies of two unexhausted administrative appeals that he recently filed which assert that the June 14, 2010 incident was intentionally set up by B-Facility staff in retaliation for plaintiff's filing of the Group Appeal (Dkt. No. 1, at 57-58 (filed June 16, 2010)), and as a rationale for keeping all black inmates in lockdown (id. at 59-60 (filed July 19, 2010)).

        The complaint generally alleges that plaintiff and the other nine inmates pursuing this action are all "Black Non-Affiliated" prisoners who were included in the Modified Program only because of their race; that the Modified Program should only have included those inmates responsible for the January 19, 2010 incident, specifically the "Black Disruptive Group" and "Southern Hispanics."  The complaint alleges that the inclusion of all black inmates in the Modified Program constitutes racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.  The complaint further alleges that such inclusion of "Black Non-Affiliated" prisoners has resulted in significant unwarranted restrictions to inmates within this group, in violation of their right to due process under the Fourteenth Amendment, and their Eighth Amendment right to be free of cruel or unusual punishment.  The complaint alleges that plaintiffs have been deprived of "basic liberties," e.g., "access to exercise/law library/general population yard/phones/full canteen/visits with family and association with fellow inmates for

1   legal and religious matters." (Cmplt. at 13.)  The complaint further alleges that no defendant is

2   entitled to qualified immunity since the governing legal principles were well established at the

3   commencement of the challenged conduct.  (Id. at 13-14.)

4            In addition to the more specific allegations set forth above, the complaint alleges

5   that defendants Cannedy, Hansen, Baker and Virga "individually and/or worked in concert" to

6   unconstitutionally implement and maintain the challenged Modified Program to include all black

7   inmates.  (Cmplt. at 12.)  The complaint also alleges that defendants Hansen and Baker "had

8   face-to-face interviews with plaintiff, so were well-aware of all issues in this complaint;" that

9   defendant Cannedy "received a direct phone call from '3rd level-appeals office' (an[d] gave the

10  impression he would correct the situation -- but failed to do so);" and that defendant Virga

11  "restored a few basic needs -- yet continued the constitutional violations -- which still continue."

12  (Cmplt. at 13.)

13           In summary, the complaint may state a cognizable claim for racial discrimination

14  in violation of the Fourteenth Amendment's Equal Protection Clause.  A strict-scrutiny standard

15  applies to racial classifications in prisons, requiring that the government prove that such

16  classification is narrowly tailored to further a compelling governmental interest.  Johnson v.

17  California, 543 U.S. 499, 505-07 (2005); see also, Richardson v. Runnels, 594 F.3d 666, 671 (9th

18  Cir. 2010).  To meet this standard, defendants must show that reasonable minds could not differ

19  regarding the necessity of the racial classification in response to the subject prison disturbance

20  and is the least restrictive alternative, i.e., is narrowly tailored to achieve legitimate prison goals.

21  Johnson, 543 U.S. at 505; Richardson, 594 F.3d at 671.  The allegations of the complaint that the

22  Modified Program implemented January 19, 2010 at CSP-SAC unnecessarily includes all black

23  inmates may state an Equal Protection claim that such classification is neither narrowly drawn

24  nor necessary to achieve the legitimate prison goals of quelling the precipitating prison

25  disturbance and reducing further associated violence.

26           The complaint may also state a cognizable claim under the Eighth Amendment

9

based on the constraints and restrictions on inmates' "basic liberties" associated with the Modified Program.  In accordance with the Eighth Amendment's prohibition against cruel or unusual punishment, a prison must provide inmates with "adequate food, clothing, shelter, sanitation, medical care, and personal safety."  Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).  In evaluating an Eighth Amendment "conditions of confinement" claim, each alleged condition is viewed individually, not the totality of conditions.  Id. at 1246-47.  However, "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise."  Wilson v. Seiter, 501 U.S. 294, 304 (1991).  The allegations of the complaint that the Modified Program improperly deprives all black inmates at CSP-SAC of identified "basic liberties," particularly "in combination," may be sufficient to state such an Eighth Amendment claim.

The same facts may support related due process claims.  "Under Sandin, a prisoner possesses a liberty interest under the federal constitution when a change occurs in confinement that imposes an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'"  Resnick v. Hayes, 213 F.3d 443, 448 (9th Cir. 2000) (quoting Sandin v. Conner, 515 U.S.472, 484 (1995)).  In addition to its "substantive" due process allegation, the complaint avers that the plaintiff inmates were deprived of their identified "liberties" without procedural due process.  "It is well established that '[t]he requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.'"  Burnsworth v. Gunderson, 179 F.3d 771, 774 (9th Cir. 1999).  Thus, premised on the blanket inclusion of all black inmates in CSP-SAC's Modified Program, the complaint may state both substantive and procedural due process claims.

Finally, while the complaint does not articulate precise connections between the

1    named defendants and the alleged constitutional violations,[5] it appears for present purposes that

2    plaintiff has appropriately named those officials most likely to have responsibility for creating,

3    implementing, maintaining and enforcing the challenged Modified Program at CSP-SAC's B

4    Facility.  The court therefore finds service of process appropriate for each of the named

5    defendants.

6           On the other hand, plaintiff has not exhausted his "failure to protect" claim, based

7    on allegations that B-Facility staff are intentionally setting up staged fights between black and

8    Hispanic inmates.  (This matter is addressed further below, in conjunction with plaintiff's motion

9    for a preliminary injunction.)  Similarly, plaintiff did not exhaust his "Canteen Appeal," although

10   his broader claim—that the inclusion of "Non-Affiliated Blacks" in the Modified Program

11   unfairly deprived this group of rights and privileges associated with the General Population—is

12   encompassed within his primary Equal Protection/Due Process/Eighth Amendment claims.

13   MOTION FOR PRELIMINARY INJUNCTION

14          Plaintiff seeks an immediate order of this court requiring "B-yard staff to stop

15   selecting Mexican (Southern-Paisa) and Black inmates for staged combat scenes on [the] general

16   population yard," and ordering that "all Black non-affiliated inmates not involved in [the]

17   January 19, 2010 racial incident off the modified lock-down program with immediate access to

18   general population activities."  (Dkt. No. 3, at 4.)  Thus, plaintiff seeks a "mandatory injunction"

19   commanding changes in current CSP-SAC policies and practices.

20          Plaintiff has not served this motion on defendants, and thus effectively seeks a

21

22          [5] Vague and conclusory allegations concerning the involvement of official personnel in
     civil rights violations are not sufficient.  See Ivey v. Board of Regents, 673 F.2d 266, 268 (9th
23   Cir. 1982).  Rather, such claims require allegations demonstrating an actual connection or link
     between the actions of the defendant and the conditions which plaintiff challenges.  See Monell
24   v. Department of Social Services, 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).
     "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of
25   § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to
     perform an act which he is legally required to do that causes the deprivation of which complaint
26   is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

                                                11

1   temporary restraining order.[6]  While it is the practice in this district to apply the same standards

2   to motions for temporary restraining orders and motions for preliminary injunction, see, e.g.,

3   Aiello v. OneWest Bank, 2010 WL 406092, *1 (E.D. Cal. 2010), a temporary restraining order

4   will be granted only in the most extraordinary of circumstances.  "Except in the most

5   extraordinary of circumstances, no temporary restraining order shall be granted in the absence of

6   actual notice to the affected party and/or counsel, by telephone or other means, or a sufficient

7   showing of efforts made to provide notice.  See Fed. R. Civ. P. 65(b)."  Local Rule 231(a).

8          "The proper legal standard for preliminary injunctive relief requires a party to

9   demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm

10  in the absence of preliminary relief, that the balance of equities tips in his favor, and that an

11  injunction is in the public interest.'"  Stormans, Inc. v. Selecky, 571 F.3d 960, 978 (9th Cir.

12  2009), quoting Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 375-76 (2008).

13  In cases brought by prisoners involving conditions of confinement, any preliminary injunction

14  "must be narrowly drawn, extend no further than necessary to correct the harm the court finds

15  requires preliminary relief, and be the least intrusive means necessary to correct the harm."  18

16  U.S.C. § 3626(a)(2).  Moreover, where, as here, "a plaintiff seeks a mandatory preliminary

17  injunction that goes beyond maintaining the status quo pendente lite, 'courts should be extremely

18  cautious' about issuing a preliminary injunction and should not grant such relief unless the facts

19  and law clearly favor the plaintiff."  Committee of Central American Refugees v. I.N.S., 795

20  F.2d 1434, 1441 (9th Cir. 1986), quoting Martin v. International Olympic Committee, 740 F.2d

21  670, 675 (9th Cir. 1984).

22         Plaintiff contends that the present circumstances meet the criteria for issuing a

23

24         [6]  A temporary restraining order is an extraordinary and temporary "fix" that the court
    may issue without notice to the adverse party if, in an affidavit or verified complaint, the movant
    "clearly show[s] that immediate and irreparable injury, loss, or damage will result to the movant
25  before the adverse party can be heard in opposition."  See Fed. R. Civ. P. 65(b)(1)(A).  The
    purpose of a temporary restraining order is to preserve the status quo pending a fuller hearing.
26  See generally, Fed. R. Civ. P. 65; see also, E.D. Cal. L. R. ("Local Rule") 231(a).

1    mandatory preliminary injunction—viz., that there is a reasonable likelihood that he and the other

2    plaintiffs will prevail on the merits of this action; that the continued retention of "Black Non-

3    Affiliated" inmates in the Modified Program, and the challenged "staged" releases of black and

4    Hispanic inmates present substantial threats of irreparable harm; that the balance of equities tips

5    in plaintiffs' favor; and that the public interest would be "well-served by protecting the

6    constitutional rights of all its members."  (Dkt. No. 3, at 3-4.)

7            While there is some likelihood that plaintiff may prevail on one or more of his

8    constitutional challenges to the Modified Program, the challenge to progressive and "staged"

9    releases of inmates is not encompassed by this suit because it has not been administratively

10   exhausted.  Both matters, however, are grounded in the deliberative decision-making processes

11   of prison officials requiring deference by the courts.  As noted by the Supreme Court, "the

12   problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy

13   solutions.  Prison administrators therefore should be accorded wide-ranging deference in the

14   adoption and execution of policies and practices that in their judgment are needed to preserve

15   internal order and discipline and to maintain institutional security."  Bell v. Wolfish, 441 U.S.

16   520, 547 (1979) (citations omitted).

17           Thus, absent a significant showing of immediate irreparable harm, this court may

18   not interpose its judgment for that of prison officials relative to matters of prison order and

19   security.  "Courts . . . look at the immediacy of the threatened injury in determining whether to

20   grant preliminary injunctions."  Privitera v. California Bd. Of Medical Quality Assurance, 926

21   F.2d 890, 897 (9th Cir. 1991) citing Caribbean Marine Services Co., Inc. v. Baldrige, 844 F.2d

22   668, 674 (9th Cir. 1988) ("a plaintiff must demonstrate immediate threatened injury as a

23   prerequisite to preliminary injunctive relief").

24           Plaintiff fails to demonstrate the possibility of immediate irreparable harm as a

25   result of the Modified Program or the metered released of selected prisoners.  The challenged

26   lockdown has been ongoing since January 2010, and the calculated release of selected prisoners,

13

1   viewed most favorably to prison officials, demonstrates an intent to carefully dismantle the

2   program with minimal incident and harm to prisoners.  This is not a situation where the facts and

3   law "clearly favor" plaintiff, <u>Committee of Central American Refugees</u>, 795 F.2d at 1441, or

4   where the court should preemptively substitute its judgment for that of prison officials.

5   Moreover, injunctive relief is not necessary to maintain the status quo.  Absent preliminary

6   injunctive relief, the constitutionality of the Modified Program will proceed to trial without

7   impairment of the court's ability to hold a full hearing and render a meaningful decision.  <u>See</u> C.

8   Wright & A. Miller, 11 <u>Federal Practice and Procedure</u>, §2947 (1973).

9           This court will therefore recommend that plaintiff's motion for a preliminary

10   injunction be denied.

11   <u>CONCLUSION</u>

12           For the foregoing reasons, IT IS HEREBY ORDERED that:

13           1.  Plaintiff's request for leave to proceed in forma pauperis (Dkt. No. 11) is

14   granted.

15           2.  Plaintiff is obligated to pay the statutory filing fee of $350.00 for this action.

16   Plaintiff is assessed an initial partial filing fee in accordance with the provisions of 28 U.S.C. §

17   1915(b)(1).  All fees shall be collected and paid in accordance with this court's order to the

18   Director of the California Department of Corrections and Rehabilitation filed concurrently

19   herewith.

20           3.  Service of process of the complaint is appropriate for all named defendants,

21   Cannedy, Hansen, Baker and Virga.

22           4.  The Clerk of Court shall provide to plaintiff a blank summons, a copy of the

23   endorsed complaint filed August 13, 2010 (Dkt. No. 1), 4 USM-285 forms, and instructions for

24   service of process on defendants Cannedy, Hansen, Baker and Virga.

25           5.  Within 30 days of service of this order, plaintiff shall return the attached

26   Notice of Submission of Documents with the completed summons, 4 completed USM-285

14

1 | forms, and 5 copies of the file-endorsed complaint filed August 13, 2010.  The court will
2 | transmit these documents to the United States Marshal for service of process pursuant to Federal
3 | Rule of Civil Procedure 4.
4 |       6.   Defendants Cannedy, Hansen, Baker and Virga shall respond to the allegations
5 | of the complaint within the deadlines stated in Federal Rule of Civil Procedure 12(a)(1).
6 |       7.   The Clerk of Court shall randomly assign a district judge to this case.
7 | Additionally, IT IS HEREBY RECOMMENDED that:
8 |       1.   Plaintiff's motion for preliminary injunction be denied without prejudice.
9 | These findings and recommendations are submitted to the United States District
10 | Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 21 days
11 | after being served with these findings and recommendations, any party may file written
12 | objections with the court and serve a copy on all parties.  Such a document should be captioned
13 | "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the
14 | objections shall be filed and served within 14 days after service of the objections.  The parties are
15 | advised that failure to file objections within the specified time may waive the right to appeal the
16 | District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
17 | DATED:  September 7, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

jone2174.scn.PI

15

1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10    SHERMAN JONES, et al.,

11              Plaintiffs,              No. 2:10-cv-2174 KJN P

12        vs.

13    C.CANNEDY, et al.,

14              Defendants.          <u>NOTICE OF SUBMISSION OF DOCUMENTS</u>

15    _____/

16

17        Plaintiff hereby submits the following documents in compliance with the court's order

18    filed _____:

19              ___1___        completed summons form

20              ___4___        completed forms USM-285

21              ___5___        copies of the File-Endorsed Complaint (Dkt. No. 1)

22

23    Dated:

24                                    _____

25                                    Plaintiff

26